IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 2:23-cv-452 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK ANTHONY GYETVAY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## **COMPLAINT**

1.    The United States of America brings this action to collect outstanding civil penalties assessed against Defendant Mark Anthony Gyetvay for his willful failure to timely report his financial interest in foreign bank accounts for calendar year 2014, as required by 31 U.S.C. § 5314 and its implementing regulations, and to collect accrued interest on such penalties, late payment penalties, and associated fees.

2.    The United States brings this action under 31 U.S.C. §§ 5321(b)(2) and 3711(g)(4)(C) at the direction of the Attorney General, and at the request of and with the authorization of a delegate of the Secretary of the Treasury.

## **JURISDICTION AND VENUE**

3.    The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 1355 because it arises under a federal statute, the United States is the plaintiff, and the action seeks recovery of civil penalties.

4.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Mr. Gyetvay is domiciled in this district and under 28 U.S.C. § 1391(b)(2) because the civil penalties at issue arose in this district. Venue is also proper in this district under 28 U.S.C. § 1395(a) because a civil proceeding for the recovery of a penalty may be prosecuted in the district where it accrues or the defendant is found.

## BACKGROUND

### Regulatory Background Regarding the Duty to Report Relations with Foreign Financial Institutions

5.     Section 5314(a) of Title 31 provides that the Secretary of the Treasury "shall require" a U.S. citizen or resident to file reports when he or she "makes a transaction or maintains a relation for any person with a foreign financial agency."

6.     Although Congress did not define what constitutes a "relation" with a foreign financial agency, the implementing regulations make clear that "relationship" is a U.S. person's "financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country." 31 C.F.R. § 1010.350(a).

7.     A report is required for any year in which the aggregate balance for such foreign financial account or accounts exceed $10,000 at any time during the calendar year. 31 C.F.R. § 1010.306(c) (2011).

8.     These relationships are required to be reported on a form titled "Report of Foreign Bank and Financial Accounts," commonly known as an

2

"FBAR." For calendar year 2014, the required FBAR form was the FinCEN Form 114. *See* 31 U.S.C. § 5314; *see also* 31 C.F.R. § 1010.350(a).

9.     The FBAR requires the disclosure of, among other things, the maximum value of each foreign account during the calendar year reported, the type of account, the account number, and the name and mailing address of the financial institution at which the account is held.

10.     Each foreign financial account must be listed separately on the FBAR, with the limited exception for persons with 25 or more accounts.

11.     The FBAR for a given calendar year is generally due on or before June 30 of the following calendar year. For the year at issue, 2014, the FBAR was due on or before June 30, 2015. 31 C.F.R. § 1010.306(c) (2011).

12.     Section 5321(a)(5) of Title 31 authorizes the Secretary of the Treasury to impose civil penalties for willful failure to comply with the reporting requirements of Section 5314. Specifically, Section 5321(a)(5)(C) provides for maximum penalty equal to the greater of $100,000 or 50% of the balance in the account at the time of the violation.

13.     An assessed penalty under 31 U.S.C. § 5321(a)(5)(C) is subject to interest and further penalties pursuant to 31 U.S.C. § 3717.

### *Mr. Gyetvay's Relations with Foreign Financial Institutions*

14.     Mr. Gyetvay is a United States citizen who was born in Orange, New Jersey in 1957. He is also a citizen of both Russia and Italy.

15.　Mr. Gyetvay graduated with a Bachelor of Science degree in Accounting from Arizona State University in 1981 and, later, a graduate studies degree in Strategic Management from Pace University in 1995.

16.　In 1992, Mr. Gyetvay obtained a certified public accountant ("CPA") license in Colorado.

17.　In 1996, Mr. Gyetvay became an audit partner in the Global Energy, Mining and Utilities practice of PricewaterhouseCoopers, based in Moscow, Russia, at which he performed audit, consulting, and various accounting-related services for the firm's clients, including Novatek, Russia's largest independent natural gas producer.

18.　In 2003, Mr. Gyetvay became the Chief Financial Officer of Novatek. As part of his compensation package, Mr. Gyetvay entered into an agreement which provided him an option to purchase shares of stock of an affiliated company incorporated in the Cayman Islands ("Cayman Affiliate"), which controlled one the largest blocks of privately held shares of Novatek. Under this call option agreement, Mr. Gyetvay received the right to purchase 120,000 shares of the Cayman Affiliate at a strike price of $164 per share over a 5-year period, ending December 1, 2009.

19.　Two years later, in 2005, Mr. Gyetvay guided Novatek through its initial public offering ("IPO") on the London Stock Exchange. In connection with the IPO, Mr. Gyetvay was promised a significant block of shares of Novatek.

20.     In October 2005, an account titled in the name of Opotiki Marketing ("Opotiki"), a Belize nominee corporate entity, was opened at Coutts & Company LTD. ("Coutts") in Zurich, Switzerland, with Mr. Gyetvay listed as the sole beneficial owner of the account.

21.     For the Opotiki account, Mr. Gyetvay requested that all correspondence from Coutts be held at the bank's "Hold Mail" counter, which meant that no correspondence concerning the account would be mailed to Mr. Gyetvay in the United States.

22.     The Opotiki account at Coutts had maximum assets under management valued at $12,650,792.

23.     In December 2007, an account titled in the name of Felicis Commercial Corp ("Felicis"), a British Virgin Islands nominee corporate entity, was also opened at Coutts with Mr. Gyetvay listed as the sole beneficial owner of the account.

24.     The Felicis account at Coutts had maximum assets under management valued at $53,116,205.

### *Mr. Gyetvay's Hires a Swiss Wealth Advisory Firm to Help him Hide his Foreign Bank Accounts*

25.     In or about 2005, Mr. Gyetvay retained a wealth advisory firm headquartered in Zurich, Switzerland (the "Swiss Wealth Firm").

26.     Between 2005 and 2015, the Swiss Wealth Firm helped Mr. Gyetvay hide and disguise his ownership and control of the Opotiki and Felicis accounts at the Swiss banks.

27.     With the assistance of the Swiss Wealth Firm, Mr. Gyetvay concealed the existence, and tax consequences of, the Opotiki and Felicis accounts as they transferred between different Swiss banks, as alleged in paragraphs 30 through 47, below.

28.     Figure 1, below, provides a general timeline of the accounts:



October 2005
Opotiki account is opened at Coutts.
December 2007
Felicis account is opened at Coutts.
June 2009
Coutts launches a tax compliance review of accounts with a U.S. nexus.
April 2010
Coutts requests evidence of U.S. tax compliance from Mr. Gyetvay.
July 2010
Mr. Gyetvay changes the beneficial owner of the Opotiki and Felicis accounts to his wife, Ms. Gavrilova. He then transfers the assets to new accounts at Hyposwiss.
October 2010
The Swiss Wealth Firm gives Hyposwiss false information about why the accounts are in the name of Ms. Gavrilova.
2013
Falcon Private Bank acquires the assets of Hyposwiss, including the Opotiki and Felicis accounts. Mr. Gyetvay keeps Ms. Gavrilova as the beneficial owner.
June 2015
Mr. Gyetvay fails to properly report the Opotiki and Felicis accounts on his 2014 FBAR.

*Figure 1*

29.    The result of Mr. Gyetvay's scheme ultimately resulted in his failure to properly report the Opotiki and Felicis accounts on his 2014 FBAR, which resulted in the assessments at issue in this case.

### After Coutts Requests Evidence of U.S. Tax Compliance, Mr. Gyetvay Closes His Accounts and Moves Them to Another Foreign Bank

30.    In or about 2008, Swiss Bank UBS publicly announced that it was the target of a criminal investigation by the IRS and the U.S. Department of Justice ("DOJ"). On February 18, 2009, the DOJ and UBS filed a deferred prosecution agreement in which UBS admitted that its cross-border banking business used Swiss privacy law to aid and assist U.S. clients in opening and maintaining undeclared assets and income from the IRS.

31.    Since at least August 2008, the UBS case, as well as other similar cases, have been closely monitored by banks operating in Switzerland, including Coutts.

32.    In October 2008, Coutts refined and enhanced its existing U.S. compliance framework to ensure that its policies and procedures adequately addressed regulatory requirements.

33.    In June 2009, Coutts launched a tax compliance review of all accounts with a broadly defined U.S. nexus. As an additional measure, Coutts retained U.S. qualified tax lawyers of an international law firm to review the account dossiers of all other U.S. clients to determine if affirmative evidence of these clients' tax compliance was on file, such as IRS Form 5471, Information

Return of U.S. Persons with Respect to Certain Foreign Corporations. Additionally, Coutts required that the client sign a declaration agreeing to the disclosure of their accounts to the IRS pursuant to applicable law.

34.    In April 2010, as part of this compliance project, Coutts requested the necessary information from Mr. Gyetvay.

35.    In July 2010, rather than comply with Coutts's request, Mr. Gyetvay caused his then-wife, Ms. Gavrilova, who was then only a Russian citizen, to be listed as the beneficial owner of the Opotiki and Felicis accounts at Coutts. In doing so, Mr. Gyetvay listed Ms. Gavrilova's Moscow address, rather than the Naples, Florida address at which she was principally residing with Mr. Gyetvay.

36.    When Mr. Gyetvay listed Ms. Gavrilova as the beneficial owner of the Opotiki account at Coutts, the bank had to collect certain information about her as part of the bank's "know your customer" requirements. In response, an individual at the Swiss Wealth Firm sent a September 13, 2010, email to Coutts falsely stating that Ms. Gavrilova was an accountant who had previously worked at a Russian company in the "finance" section, and that Mr. Gyetvay had "gifted" Opotiki and all its assets to her.

37.    Later that month, Mr. Gyetvay opened two new accounts at Hyposwiss Privatbank Zurich ("Hyposwiss") in Zurich, Switzerland, with Ms. Gavrilova named as the sole beneficial owner of the accounts. The account-opening documents requested that all correspondence from Hyposwiss be

"retained at the bank" and sent only to Mr. Gyetvay's Zurich-based wealth advisors.

38.     Mr. Gyetvay subsequently closed the Opotiki and Felicis accounts at Coutts and transferred the assets to the newly created Hyposwiss accounts, titled under the same entities. Like the Coutts accounts, the Hyposwiss accounts again listed Ms. Gavrilova's Moscow address, rather than the Naples, Florida address at which she was principally residing with Mr. Gyetvay.

39.     In October of 2010, the Swiss Wealth Firm sent a memo to Hyposwiss that provided certain false information concerning the purpose of the transfer of the accounts and the source of the funds in the accounts.

40.     In particular, the Swiss Wealth Firm falsely stated in a written memo sent to Hyposwiss that Ms. Gavrilova had friends who had accounts at Coutts and wanted to have the accounts at Hyposwiss, "where they are less obvious."

41.     In addition, the memo falsely stated that most of the assets in the Felicis account—which then exceeded $49,000,000 in value—stemmed from a "success reward" attributable to services provided by Ms. Gavrilova to Novatek, as "part of the owner's team which worked on the IPO of Novatek."

42.     In reality, Ms. Gavrilova played no role in connection with the Novatek's IPO and was never employed by, or provided services to, Novatek. In addition, she did not open the accounts at Hyposwiss.

43.     In 2013, Falcon Private Bank ("Falcon") in Zurich, Switzerland acquired the assets of Hyposwiss, including the Opotiki and Felicis accounts. Mr.

Gyetvay maintained the Opotiki and Felicis account structure that listed Ms. Gavrilova named as the sole beneficial owner of the accounts.

44.     The Opotiki account (No. XXXX4506) at Falcon had maximum assets under management valued at $9,148,420.

45.     The Felicis account (No. XXXX3116) at Falcon had maximum assets under management valued at $84,264,354.

46.     In or about mid-2014, Coutts notified Mr. Gyetvay and Ms. Gavrilova that, in connection with a program then offered to Swiss banks by DOJ called the Swiss Bank Program, Coutts intended to provide certain information concerning accounts maintained at Coutts by U.S. taxpayers and others. Coutts requested that Mr. Gyetvay and Ms. Gavrilova provide a certification that Mr. Gyetvay had either properly disclosed the existence of, and any income received in, his foreign accounts at Coutts, or that he had entered an IRS voluntary offshore disclosure program.

47.     In a written response to Coutts dated July 24, 2014, Mr. Gyetvay falsely certified that he had properly disclosed the existence of, and income received through, his accounts at Coutts. Also in July of 2014, Mr. Gyetvay caused a letter to be sent by his Switzerland-based attorney to Coutts indicating that Mr. Gyetvay would disclose, was in the process of disclosing, or had disclosed all previously undeclared foreign bank accounts and assets.

***Mr. Gyetvay's Uses his Hidden Foreign Bank Accounts to Evade his U.S. Tax Obligations***

Tax Year 2005

48.     During the 2005 tax year, Mr. Gyetvay was paid more than $250,000 in compensation by Novatek.

49.     However, Mr. Gyetvay failed to timely file his 2005 income tax return.

50.     Mr. Gyetvay did not file his 2005 tax return until 2008, when he was contacted by his former accounting firm employer to prepare the return.

51.     In his communications with the account firm, Mr. Gyetvay falsely omitted any mention of his financial interest in and authority over the Opotiki account during 2005.

52.     Consequently, Mr. Gyetvay caused the accounting firm to prepare for him a 2005 tax return that falsely claimed that Mr. Gyetvay did not have a financial interest in or authority over a financial account in a foreign country holding more than $10,000.

53.     Mr. Gyetvay signed and caused that false 2005 tax return to be filed with the IRS on or about August 14, 2008.

54.     Despite the fact that the accounting firm sent follow-up communications to Mr. Gyetvay, including those referring to FBARs (which included an FBAR template), Mr. Gyetvay failed to respond to that firm or

request that it prepare his delinquent 2006 and 2007 tax returns or file any FBARs for 2005 through 2008.

<u>Tax Years 2006–2008</u>

55.    Mr. Gyetvay did not timely file income tax returns for the tax years 2006 through 2008, despite earning substantial income during those years, and failed to remit to the IRS all of the taxes due and owing by him for those tax periods.

56.    Mr. Gyetvay did not retain an accountant to prepare his tax returns for 2006 through 2008 until about July of 2010, when, to support Ms. Gavrilova's efforts to obtain residency status in the United States and the concomitant necessity of Mr. Gyetvay to explain to immigration authorities his failure to file tax returns for the 2006 through 2008 tax years, he retained an Atlanta-based accounting firm.

57.    To aid its preparation of those tax returns, the accounting firm sent Mr. Gyetvay a detailed questionnaire for each year, which Mr. Gyetvay completed and emailed to the firm. Mr. Gyetvay also sent various information concerning his income and foreign bank accounts in separate emails to the firm.

58.    In providing his income and other information to the Atlanta-based accounting firm for the 2006–2008 tax years, Mr. Gyetvay falsely represented in the questionnaires that he had no foreign financial accounts during that time period.

59.     Moreover, in response to a follow-up email that specifically asked Mr. Gyetvay about foreign bank accounts holding more than $10,000, Mr. Gyetvay falsely represented that, from 2006 to 2008, the only foreign bank account he had with more than $10,000 was in Russia.

60.     As a result, the Atlanta-based accounting firm did not prepare FBARs for Mr. Gyetvay to properly report his interest in his Swiss bank accounts.

61.     Mr. Gyetvay also falsely reported his income to the Atlanta-based accounting firm for 2006 through 2008. For 2006, he reported to the firm that he received $593,700 in salary and other income from Novatek when, in fact, he was paid substantially more. Mr. Gyetvay also omitted over $138,000 of interest income he earned through his Swiss account at Coutts.

62.     As a result, Mr. Gyetvay caused the Atlanta-based accounting firm to prepare a tax return for him for the 2006 tax year that falsely under-reported his income and falsely stated that the only foreign account Mr. Gyetvay had during 2006 holding more than $10,000 was in Russia.

63.     Mr. Gyetvay signed the false return and cause it to be filed with the IRS on or about February 16, 2011.

64.     For tax year 2007, Mr. Gyetvay was paid significant amounts of wage and other income from Novatek and received over $231,000 in interest income through his Swiss accounts.

65.     Mr. Gyetvay also received tens of millions of dollars of income as a result of his December 1, 2007, exercise of the call option agreement, purchasing

120,000 shares of the Cayman Affiliate at the strike price of $164 per share. Mr. Gyetvay then sold 55,122 of the shares at their market price, $526.66, and directed that over $9,350,552 of the resulting case proceeds be deposited in his Opotiki account at Coutts. Mr. Gyetvay also directed the Cayman Affiliate, which maintained an account at Coutts, to register the remaining 64,878 shares in the name of Felicis.

66.    In providing his income and other information to the Atlanta-based accounting firm for the 2007 tax year, Mr. Gyetvay falsely represented that he had not engaged in any "put or call transactions" during 2007.

67.    Mr. Gyetvay also falsely reported to the firm that he received $880,580 in salary and other income from Novatek when, in fact, he was paid substantially more.

68.    As a result, Mr. Gyetvay caused the Atlanta-based accounting firm to prepare a tax return for him for the 2007 tax year that falsely under-reported his income and falsely stated that the only foreign account Mr. Gyetvay had during 2007 holding more than $10,000 was in Russia.

69.    Mr. Gyetvay signed the false tax return and caused it to be filed with the IRS on or about November 2, 2011.

70.    For the 2008 tax year, Mr. Gyetvay falsely reported to the Atlanta-based firm that he received $1,424,799 in salary and other income from Novatek when, in fact, he was paid substantially more.

15

71.     In addition, Mr. Gyetvay did not inform the account firm of over $152,000 in interest income he earned from his Swiss bank accounts at Coutts.

72.     As a result, Mr. Gyetvay caused the Atlanta-based accounting firm to prepare a tax return for him for the 2008 tax year that falsely under-reported his income and falsely stated that the only foreign account Mr. Gyetvay had during 2008 holding more than $10,000 was in Russia.

73.     Mr. Gyetvay signed the false 2008 tax return and caused it to be filed with the IRS on or about February 19, 2013.

74.     In addition to filing false tax returns for the tax years 2006 through 2008, Mr. Gyetvay rejected the Atlanta-based accounting firm's advice that Mr. Gyetvay file FBARs for the 2006 through 2009 tax years to report his foreign bank accounts.

Tax Year 2009

75.     During the tax year 2009, Mr. Gyetvay was paid significant amounts of wage and other income by Novatek. In addition, Mr. Gyetvay received during 2009, as stock-based compensation, over 7,000,000 shares of Novatek, then worth $14,000,000. Mr. Gyetvay also received over $509,000 in dividend income and over $5,000 in interest income from the Opotiki account he maintained at Coutts.

76.     However, Mr. Gyetvay failed to file a timely 2009 tax return and failed to timely pay to the IRS all of the taxes due and owing.

Tax Years 2010–2014

16

77.     During the tax year 2010, Mr. Gyetvay was paid significant amounts of wage and other income by Novatek. Mr. Gyetvay also received over $678,000 in dividends and over $4,100 in interest income through his Swiss bank accounts.

78.     However, Mr. Gyetvay failed to file a timely 2010 tax return and failed to timely pay to the IRS all of the taxes due and owing.

79.     During the tax year 2011, Mr. Gyetvay was paid significant amounts of wage and other income by Novatek. Mr. Gyetvay also received over $1 million in dividends and over $2,600 in interest income through his Swiss bank accounts.

80.     However, Mr. Gyetvay failed to file a timely 2011 tax return and failed to timely pay to the IRS all of the taxes due and owing.

81.     During the tax year 2012, Mr. Gyetvay was paid significant amounts of wage and other income by Novatek. Mr. Gyetvay also received over $1 million in dividends and over $637,000 in interest income through his Swiss bank accounts.

82.     However, Mr. Gyetvay failed to file a timely 2012 tax return and failed to timely pay to the IRS all of the taxes due and owing.

83.     During the tax year 2013, Mr. Gyetvay was paid significant amounts of wage and other income by Novatek. Mr. Gyetvay also received over $1.1 million in dividends and over $677,000 in interest income through his Swiss bank accounts.

84.     However, Mr. Gyetvay failed to file a timely 2013 tax return and
failed to timely pay to the IRS all of the taxes due and owing.

85.     During the tax year 2014, Mr. Gyetvay was paid significant amounts
of wage and other income by Novatek. Mr. Gyetvay also received over $1.6
million in dividends and over $679,000 in interest income through his Swiss
bank accounts.

86.     However, Mr. Gyetvay failed to file a timely 2014 tax return and
failed to timely pay to the IRS all of the taxes due and owing.

### *Mr. Gyetvay's False Disclosures to the IRS Streamlined Foreign Offshore Procedures*

87.     Since 2009, the IRS has offered different programs for the voluntary
disclosure of foreign assets.

88.     In 2015, the IRS offered three established programs for the voluntary
disclosure of foreign financial assets: (1) the Offshore Voluntary Disclosure
Program ("OVDP"); (2) the Streamlined Domestic Offshore Procedures
(Streamlined Domestic") and (3) the Streamlined Foreign Offshore Procedures
("Streamlined Foreign").

89.     The OVDP was "a voluntary disclosure program specifically designed
for taxpayers with exposure to potential criminal liability and/or substantial civil
penalties due to a *willful* failure to report foreign financial assets and pay all tax
due in respect of those assets." *Offshore Voluntary Disclosure Program* (last
accessed on June 22, 2023) (emphasis added). OVDP required a full disclosure

over an eight-year period, the payment of the taxes due, and a miscellaneous offshore penalty of either 27.5% or 50% of the offshore assets.

90.    The Streamlined Procedures (both Domestic and Foreign) are "available to taxpayers certifying that their failure to report foreign financial assets and pay all tax due in respect of those assets *did not result from willful conduct* on their part." *Streamlined Filing Compliance Procedures* (last accessed on June 22, 2023) (emphasis added). The Streamlined Procedures required the submission of amended returns for the previous six years, along with a narrative certifying the failure to be compliant with reporting foreign assets was due to *non-willful* disregard.  Streamlined Domestic also required a miscellaneous offshore penalty of 5% of the offshore assets.  Streamlined Foreign had no miscellaneous offshore penalty.

91.    In 2015, after Falcon announced that it entered into a Non-Prosecution Agreement with the Department of Justice pursuant to the Swiss Bank Program, Mr. Gyetvay chose to utilize the Streamlined Foreign program, which required the least disclosure and smallest amount of penalty payment.

92.    The Streamlined Foreign program is only available to taxpayers who meet the non-residency requirement that in any one or more of the most recent three years for which the U.S. tax return due date (or properly applied for extended due date) has passed: (1) the individual did not have a U.S. abode and (2) the individual was physically outside the United States for at least 330 full days.

93.     On July 13, 2015, under the penalties of perjury, Mr. Gyetvay signed

a Form 14653, *Certification by U.S. Person Residing Outside of the United States*

*for Streamlined Foreign Offshore Procedures*, to enter into the Streamlined

Foreign program.

94.     On his Form 14653, which covered tax years 2011, 2012, and 2013,

Mr. Gyetvay stated that:

> I, Mark Gyetvay, have worked and resided in Russia since
> 1995. I have made annual tax payments to the United States
> Treasury while abroad and have endeavored regularly to file
> US tax returns. Due to the increasing complexity of my US tax
> filings and the difficulty in finding qualified U.S. tax preparers
> able to navigate Russian tax and financial statements, my
> returns have become increasingly delayed. My delay in filing
> US tax returns is not due to any willfulness, but rather the
> result of my reasonable attempts to comply with increasingly
> difficult administrative requirements.

95.     Mr. Gyetvay made this certification despite owning a residence, and

living, in Naples, Florida during the time period at issue.

96.     Previously, on September 25, 2010, Mr. Gyetvay signed, also under

the penalties of perjury, a Form I-684, *Affidavit of Support Under Section 213A*

*of the Immigration and Nationality Act,* stating that his mailing address and

place of residence was located at 6849 Grenadier Boulevard, Apartment 2003,

Naples, FL 34108. Mr. Gyetvay signed this form as a sponsor of Ms. Gavrilova's

United States immigration application.

97.     Mr. Gyetvay had owned 6849 Grenadier Boulevard, Apartment 2003 since 1999, when he also registered as a Florida voter and obtained a Florida driver's license.

98.     In connection with his Streamlined Foreign filings, Mr. Gyetvay paid taxes, interest, and penalties in the amount of $4,649,609.77 for unfiled 2011 through 2013 tax returns.

### *Mr. Gyetvay's Failure to Timely Report His Relations with Foreign Financial Institutions*

Calendar Years 2008 through 2013

99.     Despite having an interest in foreign bank accounts since at least 2001—and despite being advised that he should file FBARs—Mr. Gyetvay did not file an FBAR until he made his false disclosures in the Streamlined Foreign procedure.

100.    As part of his Streamlined Foreign filings, Mr. Gyetvay filed untimely FBARs for calendar years 2008 through 2013, wherein he disclosed accounts at Coutts (Switzerland), Citibank (Russia), First United Bank (Russia), Hyposwiss (Switzerland), and Falcon (Switzerland).

101.    Although Mr. Gyetvay reported the Opotiki and Felicis accounts for years 2008 through 2013, Mr. Gyetvay's untimely FBARs were still deficient and incomplete.

102.    First, Mr. Gyetvay failed to disclose *all* accounts in which he had a financial interest in, or signature authority over. For example, Mr. Gyetvay failed to disclose other accounts at Coutts, including an account ending in 2379.

103.    Second, in each year, Mr. Gyetvay failed to properly report the account number and account value of the accounts at Citibank (Russia) and First United Bank (Russia).

104.    Additionally, in calendar year 2013, Mr. Gyetvay failed to properly report the account value of the Hyposwiss account with account number 8175.

<u>Calendar Year 2014</u>

105.    For calendar year 2014, Mr. Gyetvay had a financial interest in, or signature authority over, the Opotiki and Felicis accounts at Falcon (ending in 3116 and 4056) and accounts at Citibank (Russia) and First United Bank (Russia). These accounts had a highest aggregate balance in 2014 of $95,190,515.

106.    On June 25, 2015, Mr. Gyetvay timely filed an FBAR for 2014, which disclosed the following accounts:

| Financial Institution | Account Number | Highest Balance |
|---|---|---|
| Citibank (Russia) | XXXXXXXXXXXXXXXX1618 | $200,000 |
| First United Bank (Russia) | Various | $725,000 |
| Falcon | XXXX3116 | Unknown |
| | **Total:** | $925,000 |

107.    Mr. Gyetvay's FBAR for 2014 was inaccurate and incomplete for two reasons.

108.    First, Mr. Gyetvay falsely reported that he had signatory authority, but no financial interest, in the Falcon account with account number 3116. As a

result, Mr. Gyetvay failed to properly report the highest balance of the Falcon account with account number 3116. Mr. Gyetvay did this even though he disclosed the highest balance of this account on his FBAR for 2013.

109.   Second, Mr. Gyetvay wholly failed to report his interest in the Falcon account with account number 4056. Mr. Gyetvay did this even though he disclosed this account on his FBAR for 2013.

110.   On March 30, 2017, Mr. Gyetvay filed an amended FBAR for 2014, which disclosed the following accounts:

| Financial Institution | Account Number | Highest Balance |
|---|---|---|
| Citibank (Russia) | XXXXXXXXXXXXXXX1618 | $200,000 |
| First United Bank (Russia) | Various | $7,250,000 |
| Falcon | XXXX3116 | $79,182,063 |
| Falcon | XXXX4056 | $8,558,452 |
| | Total: | $95,190,515 |

***Mr. Gyetvay is Criminally Convicted for his Willful Failure to File an Accurate FBAR for 2014, and Other Charges***

111.   On September 22, 2021, a grand jury in the Middle District of Florida, Fort Myers Division, returned a fifteen-count indictment against Mr. Gyetvay. *See United States v. Gyetvay*, No. 2:21-cr-00083 (M.D. Fla. Sept. 22, 2021), ECF No. 3.

112.   On December 1, 2021, the grand jury returned a superseding indictment against Mr. Gyetvay. *See United States v. Gyetvay*, No. 2:21-cr-00083 (M.D. Fla. Dec. 01, 2022), ECF No. 60.

113.    On May 4, 2022, the grand jury returned a second superseding indictment against Mr. Gyetvay. *See United States v. Gyetvay*, No. 2:21-cr-00083 (M.D. Fla. May 04, 2022), ECF No. 101.

114.    Relevant here, Count Ten of the second superseding indictment charged Mr. Gyetvay with willfully failing to timely file a 2013 federal income tax return, in violation of I.R.C. § 7203. *See id.* at 28–29.

115.    Count Eleven of the second superseding indictment charged Mr. Gyetvay with willfully failing to timely file a 2014 federal income tax return, in violation of I.R.C. § 7203. *See id.*

116.    Count Twelve of the second superseding indictment charged Mr. Gyetvay with willfully and knowingly making a materially false statement in a matter within the jurisdiction of the executive branch of the Government of the United States, in violation of 18 U.S.C. §§ 1001 and 2. *See id.* at 30.

117.    Specifically, Count Twelve alleged that Mr. Gyetvay's Streamline Foreign submission falsely stated that Mr. Gyetvay's failure to report all income, pay all tax, and submit all required information returns, including FBARs, was "not due to any willfulness." *See id.*

118.    Count Thirteen of the superseding indictment charged Mr. Gyetvay with willfully failing to file an accurate FBAR for 2014, in violation of 31 U.S.C. §§ 5314 & 5322(a); 31 C.F.R. §§ 1010.350, 1010.306(c)–(d), and 1010.840(b). *See id.* at 31.

119.    Specifically, Count Thirteen alleged that Mr. Gyetvay falsely and fraudulent reported that he had signatory authority, but no financial interest, in the Falcon account with account number 3116. *See id.* at 17.

120.    By falsely claiming only signatory authority, Mr. Gyetvay was not required to list a value for the assets in that account.

121.    Despite this false representation, Mr. Gyetvay did, in fact, have a financial interest in the Falcon account with account number 3116.

122.    Count Thirteen of the second superseding indictment also alleged that Mr. Gyetvay willfully failed to disclose his financial interest in, and signature and other authority over, the Falcon account with account number 4056. *See id.* at 31.

123.    Following a jury trial, a jury found Mr. Gyetvay guilty of Counts Ten, Eleven, Twelve, and Thirteen of the second superseding indictment. *See United States v. Gyetvay*, No. 2:21-cr-00083 (M.D. Fla. March 28, 2023), ECF No. 261.

124.    Based on his criminal conviction, Mr. Gyetvay is collaterally estopped from contesting in this case his willful failure to file an accurate FBAR for 2014.

### COUNT I
### (Judgment for Penalties Under 31 U.S.C. § 5321(a)(5)(C))

125.    The United States incorporates paragraphs 1 through 124.

126.    Mr. Gyetvay failed to accurately report his Falcon account ending in 3116 on his 2014 FBAR.

127.    Additionally, Mr. Gyetvay failed to report the existence of his Falcon account ending in 4056 on his 2014 FBAR.

128.    On June 24, 2021, a delegate of the Secretary of the Treasury, in accordance with 31 U.S.C. § 5321, timely assessed against Mr. Gyetvay a total penalty of $38,606,520 for his willful failure to file an accurate FBAR for 2014.

129.    On July 6, 2021, a delegate of the Secretary of the Treasury sent Mr. Gyetvay notice of the assessment of the FBAR penalties and demand for payment.

130.    As of June 14, 2023, Mr. Gyetvay owes $43,848,545.01, for willful FBAR penalties for 2014, plus accrued interest and failure to pay penalties under 31 U.S.C. § 3717, and associated fees. Interest and other statutory additions continue to accrue.

WHEREFORE, the United States of America requests that the Court:

A.    Enter judgment against Mark Anthony Gyetvay and in favor of the United States in the amount of $43,848,545.01 for the FBAR penalties assessed against him for calendar year 2014 under 31 U.S.C. § 5321(a)(5), plus the late payment penalties assessed against him pursuant to 31 U.S.C. § 3717(e)(2), as well as further interest and statutory additions thereon as allowed by law from the date of assessment to the date of payment; and

B.    Award the United States its costs incurred in connection with this action, along with such other relief as justice requires.

26

Dated: June 22, 2023                              Respectfully Submitted,

                                                  David A. Hubbert
                                                  Deputy Assistant Attorney General

                                                  */s/ Jeremy A. Rill*
                                                  Jeremy A. Rill
                                                  Lead Counsel
                                                  Trial Attorney, Tax Division
                                                  */s/ Hana B. McQuillan*
                                                  Trial Attorney, Tax Division
                                                  U.S. Department of Justice
                                                  P.O. Box 14198
                                                  Washington, D.C. 20044
                                                  202-307-0513 (Rill)
                                                  202-616-2904 (McQuillan)
                                                  202-514-4963 (fax)
                                                  Jeremy.A.Rill@usdoj.gov
                                                  Hana.B.McQuillan@usdoj.gov

                                                  Of Counsel:

                                                  Roger B. Handberg
                                                  United States Attorney
                                                  Middle District of Florida

                                                  *Attorneys for the United States*