UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

                                    Case No.: 2:23-cv-452-JLB-KCD

MARK ANTHONY GYETVAY,

     Defendant.

_____/

## ORDER

This matter comes before the Court on Defendant's Motion to Dismiss. (Doc. 13).  Plaintiff responded (Doc. 22) and Defendant filed a reply (Doc. 30).  For the following reasons, the Motion to Dismiss is **DENIED**.

## BACKGROUND[1]

The United States seeks to collect penalties assessed against Mark Anthony Gyetvay ("Defendant") for his allegedly willful failure to timely and accurately report his financial interest in foreign bank accounts on his 2014 Report of Foreign Bank and Financial Accounts ("FBAR"), as required by 31 U.S.C. § 5314.  (Doc. 1 at ¶ 1).  The United States brings this action under 31 U.S.C. §§ 5321(b)(2) and

---

[1] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citation omitted).  Accordingly, this background section relies on the facts recited in the Complaint.  (*See* Doc. 1).

3711(g)(4)(C) at the direction of the Attorney General, and at the request of and with the authorization of a delegate of the Secretary of the Treasury. (*Id.* at ¶ 2).

Mr. Gyetvay is a United States citizen who is also a citizen of both Russia and Italy. (*Id.* at ¶ 14). He holds a Bachelor of Science degree in accounting and a graduate studies degree in Strategic Management. (*Id.* at ¶ 15). Mr. Gyetvay is also a certified public accountant ("CPA") licensed in Colorado. (*Id.* at ¶ 16).

In 1996, Mr. Gyetvay became a partner at PricewaterhouseCoopers. (*Id.* at ¶ 17). He was based in Moscow, Russia, and he performed audit, consulting, and various accounting-related services for the firm's clients, which included Novatek, Russia's largest independent natural gas producer. (*Id.*) In 2003, he became the Chief Financial Officer of Novatek. (*Id.* at ¶ 18). Under a call option agreement, he received the right to purchase 120,000 shares of an affiliated company in the Cayman Islands (the "Cayman Affiliate"). (*Id.*) Two years later, Mr. Gyetvay guided Novatek through its initial public offering ("IPO") in the London Stock Exchange. (*Id.* at ¶ 19). In connection with the IPO, Mr. Gyetvay was promised a significant block of Novatek shares. (*Id.*)

In October 2005, an account (the "Original Opotiki Account") titled in the name of Opotiki Marketing, a Belize nominee corporate entity, was opened at Coutts & Company LTD. ("Coutts") in Zurich, Switzerland, with Mr. Gyetvay listed as the sole beneficial owner. (*Id.* at ¶ 20). Mr. Gyetvay requested that all correspondence from Coutts relating to the Opotiki Account be held at the bank's "Hold Mail" counter, meaning that no correspondence concerning that account

would be mailed to Mr. Gyetvay in the United States.  (*Id.* at ¶ 21).  The Opotiki

Account had maximum assets under management valued at $12,650,792.  (*Id.* at

¶ 22).

In December 2007, an account (the "Original Felicis Account") titled in the

name of Felicis Commercial Corp. ("Felicis"), a British Virgin Islands nominee

corporate entity, was opened at Coutts with Mr. Gyetvay listed as the sole beneficial

owner.  (*Id.* at ¶ 23).  The Felicis Account had maximum assets under management

valued at $53,116,205.  (*Id.* at ¶ 24).

Sometime in 2005, Mr. Gyetvay retained a wealth advisory firm

headquartered in Zurich, Switzerland (the "Swiss Wealth Firm").  (*Id.* at ¶ 25).  The

Complaint alleges that "[b]etween 2005 and 2015, the Swiss Wealth Firm helped

Mr. Gyetvay hide and disguise his ownership and control of" the Opotiki and Felicis

Swiss Accounts.  (*Id.* at ¶ 26).  The Complaint further alleges that the Swiss Wealth

Firm helped Mr. Gyetvay "conceal[] the existence, and tax consequences of, the

Opotiki and Felicis accounts as they transferred between different Swiss banks."

(*Id.* at ¶¶ 27–28).

The Complaint then recounts a long history of Mr. Gyetvay's actions with

respect to the Original Opotiki Account, the Original Felicis Account, and certain

subsequently opened accounts, as set forth below.  (*Id.* at ¶¶ 30–98).  After Swiss

Bank UBS announced that it was the target of a criminal investigation by the IRS

and the DOJ, in June 2009, "Coutts launched a tax compliance review of all

accounts with a broadly defined U.S. nexus."  (*Id.* at ¶¶ 30–33).  In April 2010, as

part of the compliance project, Coutts requested certain information from Mr. Gyetvay. (*Id.* at ¶¶ 33–34). The Complaint alleges that Mr. Gyetvay did not respond. (*Id.* at ¶ 35). Instead, in July 2010, Mr. Gyetvay listed his wife, Ms. Gavrilova (who, at the time, was only a Russian citizen) as the beneficial owner of the Original Opotiki Account and the Original Felicis Account. (*Id.* at ¶ 35). In doing so, he listed Ms. Gavrilova's Moscow address, rather than the Naples, Florida address at which the Complaint alleges she was "principally residing" with Mr. Gyetvay. (*Id.*) In response to Coutts's September 13, 2010 request for certain information about Ms. Gavrilova, an individual at the Swiss Wealth Firm sent an email to Coutts stating that Ms. Gavrilova was an accountant and that Mr. Gyetvay gifted Opotiki Marketing and all its assets to her. (*Id.* at ¶ 36).

Later in September, Mr. Gyetvay opened two new accounts at Hyposwiss Privatbank Zurich ("Hyposwiss") in Zurich, Switzerland, and named Ms. Gavrilova the sole beneficial owner of the accounts. (*Id.* at ¶ 37). "The account-opening documents requested that all correspondence from Hyposwiss be 'retained at the bank' and sent only to Mr. Gyetvay's Zurich-based wealth advisors." (*Id.*) The Hyposwiss Accounts listed Ms. Gavrilova's Moscow address. (*Id.* at ¶ 38).

Mr. Gyetvay then closed the Original Opotiki Account and the Original Felicis Account at Coutts and transferred the assets to the Hyposwiss Accounts. (*Id.*) In October 2010, the Swiss Wealth Firm sent a memo to Hyposwiss that provided certain allegedly false information concerning the purpose of the transfer of the accounts and the source of the funds in the accounts. (*Id.* at ¶ 39). One of the

allegedly false representations indicated that "Ms. Gavrilova had friends who had accounts at Coutts and wanted to have the accounts at Hyposwiss, 'where they are less obvious.'" (*Id.* at ¶ 40). The memo also stated that most of the assets stemmed from a "success reward" attributable to services provided by Ms. Gavrilova to Novatek. (*Id.* at ¶ 41). Ms. Gavrilova was never employed by or provided services to Novatek. (*Id.* at ¶ 42).

In 2013, Falcon Private Bank ("Falcon") in Zurich, Switzerland acquired the assets of Hyposwiss. (*Id.* at ¶ 43). The Opotiki account at Falcon (the "Falcon Opotiki Account") had maximum assets under management valued at $9,148,420. (*Id.* at ¶ 44). The Felicis account at Falcon (the "Falcon Felicis Account") had maximum assets under management valued at $84,264,354 that year. (*Id.* at ¶ 45). These assets maintained the same structure, listing Ms. Gavrilova as the sole beneficial owner of the accounts.

Sometime in 2014, Coutts notified Mr. Gyetvay and Ms. Gavrilova that it intended to provide certain information concerning accounts maintained at Coutts by U.S. taxpayers and others in connection with a program the DOJ offered to Swiss banks. (*Id.* at ¶ 46). Coutts requested that Mr. Gyetvay and Ms. Gavrilova provide a certification that Mr. Gyetvay had either properly disclosed the existence of, and any income received in, his foreign account at Coutts, or that he had entered an IRS voluntary offshore disclosure program. (*Id.*) In a written response to Coutts dated July 24, 2014, Mr. Gyetvay allegedly falsely certified that he had properly disclosed the existence of, and income received through, his accounts at Coutts. (*Id.* at ¶ 47).

In that same month, he caused his Switzerland-based attorney to send a letter to Coutts indicating that he would disclose, was in the process of disclosing, or had disclosed all previously undeclared foreign bank accounts and assets.  (*Id.*)

The Complaint then explains various ways in which Mr. Gyetvay allegedly used his foreign bank accounts to evade his United States tax obligations, including failing to timely file tax returns, representing to accounting firms that he had no foreign financial accounts, failing to report the full amount of his salary to an accounting firm, and falsely representing to the IRS via a Certification by U.S. Person Residing Outside of the United States for Streamlined Foreign Offshore Procedures that he has worked and resided in Russia since 1995.  (*See id.* at ¶¶ 48–98).

The Complaint alleges that "[d]espite having an interest in foreign bank accounts since at least 2001—and despite being advised that he should file FBARs—Mr. Gyetvay did not file an FBAR" until he made false disclosures during the Streamlined Foreign procedure, which was a program established by the IRS for the voluntary disclosure of foreign financial assets. (*Id.* at ¶¶ 88, 99–100).  As part of his Streamlined Foreign filings, Mr. Gyetvay filed untimely FBARs for calendar years 2008 through 2013, wherein he disclosed, among others, accounts at Coutts, Hyposwiss, and Falcon.  (*Id.* at ¶ 100).  But the Complaint alleges that his untimely FBARs were "still deficient and incomplete."

First, Mr. Gyetvay failed to disclose all accounts in which he had a financial interest or over which he had signature authority.  (*Id.* at ¶ 102).  Second, Mr.

Gyetvay failed to properly report the account number and account value of certain accounts in Russia. (*Id.* at ¶ 103). Finally, the Complaint alleges that, in calendar year 2013, he failed to properly report the account value of a Hyposwiss account. (*Id.* at ¶ 104).

For calendar year 2014, the Complaint alleges that Mr. Gyetvay had a financial interest in the Falcon Opotiki Account and the Falcon Felicis Account, as well as accounts in Russia at Citibank and First United Bank. (*Id.* at ¶ 105). The accounts had a highest aggregate balance in 2014 of $95,190,515, but on his 2014 FBAR (which was timely filed), he disclosed that the highest aggregate balance of his accounts was $925,000 and reported that the balance in his Falcon account was "[u]nknown." (*Id.* at ¶¶ 105–06). Mr. Gyetvay also allegedly falsely reported that he had signatory authority, but no financial interest, in one of the accounts and failed to report his interest in another account (though he had reported both accounts on his FBAR for 2013). (*Id.* at ¶¶ 108–09). Mr. Gyetvay filed an amended FBAR for 2014 in March 2017, indicating that the highest balance in the accounts was $95,190,515. (*Id.* at ¶ 110).

Following a jury trial, Mr. Gyetvay was found guilty of willfully failing to timely file a 2013 federal income tax return, willfully failing to timely file a 2014 federal income tax return, willfully making a materially false statement in a matter within the jurisdiction of the executive branch of the Government, and willfully failing to file an accurate FBAR for 2014. (*Id.* at ¶¶ 115–23). The "materially false statement" was that his Streamline Foreign submission falsely stated that his

failure to report all income, pay all tax, and submit all required information returns, including FBARs, was "not due to any willfulness." (*Id.* at ¶ 117).  And the count alleging willful failure to file an accurate FBAR for 2014 alleged that Mr. Gyetvay falsely and fraudulently reported that he had signatory authority over, but not a financial interest in, the Falcon Felicis Account when he did have a financial interest in that account.  (*Id.* at ¶¶ 119–21).

On June 22, 2023, the Government filed the Complaint, which consists of one count, requesting a judgment for penalties under 31 U.S.C. § 5321(a)(5)(C).  (*Id.* at ¶¶ 125–30).  Count I alleges the following:

- Mr. Gyetvay failed to accurately report the existence of the Falcon Felicis Account (account ending in 0311) on his 2014 FBAR.  (*Id.* at ¶ 126).

- Mr. Gyetvay failed to report the existence of a Falcon account ending in 4056 on his 2014 FBAR.  (*Id.* at ¶ 127).

- On June 24, 2021, a delegate of the Secretary of the Treasury assessed a penalty of $38,606,520 against Mr. Gyetvay for his failure to file an accurate FBAR for 2014.  (*Id.* at ¶ 128).

- On July 6, 2021, a delegate of the Secretary of the Treasury sent Mr. Gyetvay notice of the assessment of the FBAR penalties and demand for payment. (*Id.* at ¶ 129).

- As of June 14, 2023, Mr. Gyetvay owes $43,848,545.01 for willful FBAR penalties for 2014, plus accrued interest, failure to pay penalties, and

associated fees.  Interest and other statutory additions continue to accrue. (*Id.* at ¶ 130).

On October 3, 2023, Mr. Gyetvay filed a motion to dismiss the Complaint, arguing that (1) the penalty must be limited to $100,000, (2) the Government fails to allege a "willful" FBAR violation in connection with the Falcon Felicis Account; (3) the penalty is "arbitrary and capricious" and violates the Administrative Procedure Act ("APA"); and (4) the penalty violates the Eighth Amendment.  (*See* Doc. 13).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed for failure to state a claim upon which relief can be granted.  To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard of plausibility is met when the plaintiff pleads enough factual content "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When reviewing a motion to dismiss, courts must accept all factual allegations contained in the complaint as true and view the facts in the light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).  Legal conclusions, however, "are not entitled to the assumption of truth." *Ashcroft*, 556 U.S. at 664.  "[C]onclusory allegations, unwarranted factual deductions or legal

conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

**DISCUSSION**

I.    **Whether the Government has sufficiently alleged that Defendant acted willfully.**

Section 5314(a) of the Bank Secrecy Act of 1970 (the "BSA"), titled, "Records and reports on foreign financial agencies," states that the Secretary of the Treasury (the "Secretary") "shall require" U.S. citizens "to keep records, file reports, or keep records and file reports," when they "make[] a transaction or maintain[] a relation for any person with a foreign financial agency."  31 U.S.C. § 5314(a).[2]

Section 5321(a) goes on to authorize the Secretary to impose a maximum of $10,000 civil penalty for non-willful violators of the reporting provisions.  *Id.* § 5321(a)(5)(B)(i); 31 C.F.R. § 1010.810(g) (delegating to the Commissioner of Internal Revenue Service "the authority to: assess and collect civil penalties" set forth in 31 U.S.C. § 5321).  But no penalty can be imposed if the violation was "due to

---

[2] The implementing regulation for this statute provides:

> Each United States person having a financial interest in, or signature or other authority over, a bank . . . or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons.

31 C.F.R. § 1010.350(a).

10

reasonable cause" and "the amount of the transaction or the balance in the account at the time of the transaction was properly reported." 31 U.S.C. § 5321(a)(5)(B)(ii).

Where the violation of section 5314's foreign account and transaction reporting requirements is determined to be willful, section 5321 authorizes the Secretary to fine violators up to "the greater of . . . $100,000, or . . . in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account, [50% of] the balance in the account at the time of the violation." *Id.* § 5321(a)(5)(C)(i), (D)(ii).

The Eleventh Circuit has explained that "[w]illful conduct in the FBAR context includes knowing and reckless conduct." *United States v. Schwarzbaum,* 24 F.4th 1355, 1358 (11th Cir. 2022) (citing *United States v. Rum*, 995 F.3d 882, 888– 89 (11th Cir. 2021)). Recklessness is defined as "'conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id*. at 1363 (citations omitted).

As an initial matter, taking the allegations of the Complaint set forth above as true, as the Court must do when evaluating a motion to dismiss, Defendant is a financially educated, savvy, and sophisticated international businessman with an extensive background as a CPA, audit partner, CFO, and consultant, who retained a Swiss wealth advisory firm to help him hide his ownership and control of certain foreign accounts, transferring such accounts between different Swiss banks. (Doc. 1 at ¶¶ 15–19). To that end, the Complaint alleges that when asked to provide evidence of U.S. tax compliance, Defendant made his wife the beneficial owner of

the account and then transferred the assets to new accounts, where he requested that all correspondence be retained at the bank and only sent to his Zurich-based wealth advisors.  (*Id.* at ¶¶ 33–38).  Additionally, the Complaint alleges that Defendant swore on his Streamlined Foreign Program certification that he has worked and resided in Russia since 1995, when in fact he had a home in Florida. (*Id.* at ¶¶ 94–95). With these allegations taken as true for the purpose of deciding the motion to dismiss, the Court finds that the Complaint adequately alleges that Mr. Gvetvay knowingly worked to skirt compliance with FBAR.

Mr. Gyetvay does not appear to deny that the above allegations amount to willfulness generally, but instead asserts that the allegations regarding his failure to disclose his financial interest in the Falcon Felicis Account and the account's highest balance cannot amount to a willful violation because "[n]o court has ever held such omissions willful." (Doc. 13 at 18).  Put differently, Mr. Gyetvay believes that because he disclosed the existence of the Falcon Felicis Account, any other omissions on his FBAR cannot, as a matter of law, be found willful.

The Court disagrees.  After careful review of the statute and the Complaint's allegations, the Court finds that the Government has adequately alleged that Mr. Gyetvay's actions were reckless.  The BSA indicates that a penalty may apply "in the case of any person willfully violating, or willfully causing ***any*** violation of, any provision of section 5314 . . . ." 31 U.S.C. § 5321(a)(5)(C) (emphasis added).  Section 5314(a), in turn, instructs that reports shall contain information about "the legal capacity in which a participant is acting" and "a description of the transaction."  31

U.S.C. § 5314(a)(2)–(4).  Accordingly, a failure to disclose one's financial interest and the account's highest balance is a violation that may be subject to a willfulness penalty.  At bottom, accepting the Complaint's allegations as true, the Court finds that Mr. Gyetvay's conduct was, from an objective standard, reckless because it entailed an "'unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Schwarzbaum,* 24 F.4th at 1363 (citations omitted).

Mr. Gyetvay also argues that the Internal Revenue Manual (the "IRM") recites a similar fact pattern to the one set forth in the Complaint and "explains that a 'willful' penalty would not apply under such facts. (Doc. 13 at 20). The Court disagrees.  The IRM states that "[t]he penalty for a willful violation should not apply ***absent other evidence that may indicate willfulness***."  IRM 4.26.16.5.5.1(7)a. (emphasis added).  As set forth above, the Complaint is rife with allegations that would indicate that a willful violation took place.  Accordingly, this argument falls short.

In a nutshell, the Complaint alleges myriad deliberate actions over the course of a decade by Mr. Gyetvay that establish plausible allegations of willfulness under the statutory framework.  Mr. Gyetvay presents no persuasive argument why the Court should dismiss the Government's claim that Mr. Gyetvay's FBAR violation was willful.  This is not to say that the Government will be able to prove up the Complaint's allegations at a later stage of litigation.  It simply means that the Complaint, as alleged, supports an FBAR violation.

II.    **Whether any penalty must be limited to $100,000.**

Having found that the Government has adequately alleged that Mr. Gyetvay's FBAR violation was willful, the Court turns to Mr. Gyetvay's argument that the penalty must be limited to $100,000.  (Doc. 13 at 12–17).  He argues that "[t]he complaint does not allege anything that could remotely be described as failing to 'report the existence' of the [Falcon Felicis Account] or 'identifying information' about the account."  (Doc. 13 at 13).  The Court disagrees.

Under the plain language of the statute, when a person "willfully violat[es], or willfully caus[es] a violation of, any provision of section 5314," the maximum penalty is the greater of: (i) $100,000 or (ii) "in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account, [50% of] the balance in the account at the time of the violation."  31 U.S.C. § 5321(a)(5)(C)–(D).  Thus, it is pellucidly clear that Congress intended to penalize willful violators with hefty monetary fines.

The Court finds that the most natural reading of the disjunctive phrase "in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account" sweeps in two categories of violators: (1) those who flat out failed to report the existence of foreign account and, (2) those who did disclose the existence of a foreign bank account but failed to provide the identifying information about an account.  In other words, the reporting requirement for a willful violator is a full reporting requirement, not a partial reporting requirement, as Mr. Gyetvay suggests.  His

attempt to sidestep disclosing all information required on the FBAR by choosing to disclose only the existence of a foreign bank account belies the plain and ordinary meaning section 5321(a)(5)(D)(II)'s text.  As Mr. Gyetvay interpretation would have it, those who *willfully* neglected to comply with the foreign bank accounts reporting requirements need only comply with disclosure of the existence of the account and nothing more.  To accept Mr. Gyetvay's interpretation would necessarily require this Court to rewrite the statute, which is not this Court's role. What the Secretary constitutes as the "identifying information" and proving up what Mr. Gyetvay neglected to provide are separate matters that are best addressed at the summary judgment stage.

Briefly, Mr. Gyetvay also argues that his interpretation makes sense within the meaning of the statute because taxpayers who disclose twenty-five or more foreign financial accounts need only provide the number of financial accounts and other basic information.  (Doc. 13 at 15).  As Mr. Gyetvay points out, the Supreme Court has used the Secretary's relaxed regulations for individuals with more than twenty-five accounts as an example to show that the BSA "aims to provide the government with a report sufficient to tip it to the need for further investigation, not to ensure the presentation of every detail or maximize revenue for each mistake." *Bittner v. United States*, 598 U.S. 85, 100 (2023).  But *Bittner* specifically addressed *non-willful* violations and analyzed the BSA's treatment of such non-willful violations.  Moreover, this Court's interpretation of the statute is consistent with the Supreme Court's finding that the BSA was not written "to ensure the

15

presentation of every detail or maximize revenue for each mistake." *Id.* Willful

violations are not, by definition, mere honest mistakes. *See Schwarzbaum*, 24 F.4th

at 1362–63 ("[W]illful conduct, in the FBAR civil penalty context, includes knowing

or reckless conduct" and "the recklessness standard is . . . conduct violating an

objective standard: action entailing an unjustifiably high risk of harm that is either

known or so obvious that it should be known.") (internal quotation marks omitted).

Moreover, the broader statutory context supports the Court's conclusion. In

the section providing for penalties for non-willful violations, the BSA specifies that

"[n]o penalty shall be imposed . . . with respect to any violation if . . . such violation

was due to reasonable cause, and . . . the amount of the transaction or the balance

in the accounts at the time of the transaction was properly reported." 31 U.S.C.

§ 5321(a)(5)(B)(ii). In other words, had Congress wished to carve out a specific

exception from increased penalties for individuals who reported accounts but

willfully failed to properly report the balance in such accounts or to report the

individuals who had a financial interest in those account, it knew how to do so; but

it chose not to. *See Animal Legal Def. Fund. v. U.S. Dep't of Agric.*, 789 F.3d 1206,

1217 (11th Cir. 2015) ("Where Congress knows how to say something but chooses

not to, its silence is controlling."); c*f. Pinares v. United Technologies Cap.*, 973 F.3d

1254, 1261–62 (11th Cir. 2020) ("[E]lsewhere in the PAA, Congress expressly

contemplated discovery tolling. . . . Since Congress knew how to provide for

discovery tolling—but chose not to—the 'familiar easy-to-say-so-if-that-is-what-

was-meant' rule of statutory interpretation has full force here.") (quoting Antonin

Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts at 181–82

(2012) (internal quotation marks and citations omitted)).

The Complaint alleges that Mr. Gyetvay falsely reported (i) that he had

signatory authority over, but no financial interest in, the Falcon Felicis Account and

(ii) the highest balance of that account for 2014.  (Doc. 1 at ¶¶ 23, 108).  Because the

Complaint adequately alleges that Mr. Gyetvay failed to report "identifying

information required to be provided with respect to an account," he may be subject

to a penalty that is the greater of $100,000 or 50 percent of the balance in the

account at the time of the violation because of his failure to report "any identifying

information required to be provided with respect to an account."  *See* 31 U.S.C. §

5321(a)(5)(C)–(D).  The Court is unpersuaded by Mr. Gyetvay's arguments

otherwise and therefore declines to limit the amount of damages in this matter to

$100,000 at this stage of the litigation.  The Court thus rejects this argument based

on the facts it has taken as true from the complaint.  Mr. Gyetvay may re-raise this

argument at the summary judgment stage.

III.   **Whether the penalty is "arbitrary and capricious" such that it violates the APA.**

The Court turns next to Defendant's assertion that the penalty is arbitrary

and capricious and violates the APA.  (Doc. 13 at 21–23).  "When a party challenges

agency action under the APA, the district court does not perform its normal role but

instead sits as an appellate tribunal."  *Schwarzbaum*, 24 F.4th at 1364; *see also* 5

U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .").

Because the Court does not have before it the administrative record regarding the IRS's decision-making process for its FBAR penalty calculation at the motion to dismiss stage, the Court declines to address this argument at this time.

IV.    **Whether the fine violates the Eighth Amendment.**

Finally, Mr. Gyetvay asks the Court to dismiss the Complaint because the IRS's fine is excessive and violates the Eighth Amendment.  (Doc. 13 at 24–27).  If the Court finds that the FBAR penalty is a fine subject to the Eighth Amendment (which the Court expressly does not do in this Order), the Court will then have to address whether such fine is excessive.  Because the fine that Mr. Gyetvay complains is excessive is based on the Government's finding that the violations were willful, the Court will not consider any Eighth Amendment challenge until, at minimum, willfulness is finally determined.  *See* Fed. R. Civ. P. 42(b) (allowing the Court to order separate trial of one or more separate issues "to expedite and economize"); *cf. United States v. $633,021.67 in U.S. Currency*, 842 F. Supp. 528, 535 (N.D. Ga. 1993) (in a civil forfeiture context, "[b]efore evaluating whether the size of a forfeiture is excessive, a court must first determine how much of the seized property will actually be forfeited.  Because it would be premature for this Court to make such a determination at this stage in the proceedings, it is not yet possible to evaluate the allegedly excessive nature of any yet-to-occur forfeiture.").

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. 13) is

**DENIED**.

**ORDERED** at Fort Myers, Florida on May 15, 2024.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE